

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00044-CR

TREVOR SCOTT COPELAND, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 27983

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

Trevor Scott Copeland was sentenced to fifty years' imprisonment following his conviction by a jury of intentionally or knowingly causing serious bodily injury to L.H., a two-year-old child. On appeal, Copeland argues (1) that the evidence is legally insufficient to support his conviction, (2) that he received ineffective assistance because counsel failed to hire an expert to combat testimony by physicians that L.H.'s injuries were caused by blunt-force trauma and (3) that the trial court erred in admitting two posts made by Copeland on his internet Facebook page months before the date of the incident. We find that legally sufficient evidence supports Copeland's conviction, ineffective assistance cannot be shown on the record before us, and although the trial court erred in admitting the Facebook posts, the error was harmless. We affirm the trial court's judgment.

## I.      The Evidence Is Legally Sufficient to Sustain the Conviction

L.H.'s mother, Erin Saari, met Copeland at a party and befriended him "[a]round the end of July, beginning of August" in 2011. Copeland moved into a trailer with Saari and L.H. at "[t]he end of October." Shortly thereafter, Copeland and Saari "became boyfriend/girlfriend." Saari believed that her relationship with Copeland was over because she "had gotten mad at him and threw something" at him on December "4th or the 5th" and he told her that "he didn't want to be with [Saari] anymore." Copeland continued to live with Saari and L.H.

Copeland and Saari "decided that [they] were going to drink" whiskey while L.H. was asleep on the evening of December 6. Saari testified she "[g]ot drunk with [Copeland]. Listened

2

to some music. Had sex. Checked on [L.H.]. Went to the bathroom and then went to bed"[1] at 10:00 p.m. Copeland woke Saari in the middle of the night. He "had [L.H.] in his arms and [was] asking [Saari] why she was outside." Saari noticed a scratch on L.H.'s head and shoulder and asked Copeland to give the child to her. Copeland refused. Instead of retrieving the child, who was not crying but was "staring blankly," Saari "turned around and went to bed."[2] Before she fell asleep, she saw that Copeland put L.H. "on the loveseat and went to sleep with her on the loveseat with him."

Saari "woke up in the morning around 9:00 o'clock" to find L.H. standing on top of Copeland and stomping on him by "lifting up her leg as high as she could and pushing down with a lot of force." Copeland "started spanking her." When Saari took the child away from Copeland, L.H. "started throwing up." Saari testified, "I gave her something to drink, and she just kept saying she was thirsty; and every time I would give her something to drink, she would throw it up, so I decided to call the doctor" because L.H. "had been sick all weekend." Saari also noticed for the first time that "[t]he backs of her legs [were] very bruised . . . [a]nd she had blotches around her eyes." Saari asked Copeland what had happened and he told her that "he went outside and found her outside by the steps." He explained that "she might have fallen out of the window because her window was open."

---

[1]Saari testified that L.H. "was fine" when she checked on her except for a bruise on L.H.'s leg, which she noticed before she and Copeland started drinking.

[2]She admitted that she "wasn't thinking clearly . . . [b]ecause [she] was drunk."

Saari took L.H. to the hospital and informed health care providers that she "thought [L.H.] had fallen out of the window." Dr. Mauricio Trujillo, a board certified emergency room physician, treated L.H. and initially noticed that she had

> quite a bit of bruising and abrasions on multiple aspects of the child's body, from her face to her shoulder to her hip to her feet.
>
> And around her eyes, she had some petechiae that was noted on my medical record as well, which are little white 1-millimeter -- not white -- small 1-millimeter red dots, which are sometimes seen most commonly with trauma, and is a break in a capillary or little blood vessel in your skin.
>
> So any kind of direct pressure or blunt trauma will cause those little capillaries to break and release blood. And you have this rash that we call petechiae, and she had those around her face and both eyes.

He concluded that "[f]alling out of a window . . . did not correlate with" "the number of injuries that this child had on my physical examination." L.H. was transferred to Dallas Children's Medical Center by ambulance.

Dr. Matthew Cox treated L.H. at Children's Medical. L.H. "had bruises from head to toe," and "was not responding." She was immediately placed "on life support measures, had a breathing tube in place and was sedated because of severe lung problems" and "injury or bruises to her lung tissue." "[B]ruising on both sides of her neck" in conjunction with "petechiae on her face," led to "a high degree of concern of strangulation." L.H. also had injuries to her abdomen, heart, liver, and pancreas, and remained on life support for "several days." Cox testified that L.H. "was near death." He concluded that the injuries resulted from "high-force-type" blunt-force trauma because a fall from a window "wouldn't be enough force" to cause them. L.H. remained in Cox's care for three weeks.

4

Saari returned to the trailer after L.H.'s transfer to Children's Medical. After a discussion with Copeland, the two searched the Internet for "what kind of sentence you would get for a child abuse case." Copeland told Saari "that he was going to go down for this whether he did it or not." While Saari made several visits to Children's Medical, Copeland did not visit L.H. in the hospital.

Saari testified that Copeland had "[o]ccasionally" disciplined L.H. by spanking her "[s]ometimes lightly; sometimes hard." However, she told the jury that she did not believe in disciplining a child with such force that it would leave bruises and denied that she caused any of the injuries she witnessed on L.H.

Saari testified that the bedroom windows were closed when she put L.H. to bed because it was "[v]ery cold" on that December night. To open the window, "two knobs on either side" of the window had to be depressed. Because it took a "good amount" of Saari's strength to open the window, she did not believe that L.H. was capable of opening the window on her own.

Child Protective Services (CPS)[3] and the Greenville Police Department were called to investigate the cause of the injury. CPS investigator Kenny Stillwagoner went to Saari's home to inspect the window from the outside. The window was "4 foot, 4 inches" from the ground. Stillwagoner testified that there were no footprints on the ground and that it did not "look like anything had been disturbed in the area under the window." Roger Seals, an investigator for the Hunt County Sheriff's Office, entered the trailer pursuant to a search warrant. Seals testified that "the bottom of the window to the floor was 20 inches." Seals also confirmed that "you have to . .

---

[3]As early as October 2011, Saari was being investigated by CPS for "possible physical abuse" and admitted that she "[s]ometimes" used marihuana with Copeland. Saari voluntarily relinquished her parental rights to L.H.

. hold the tabs in and keep them held in to raise the window" because "there's little knobs to where the tabs will catch about every inch or so if you don't pull the tabs in." The tabs were "approximately 2 feet apart."

Detective Joel Gibson interviewed Saari[4] and Copeland. Gibson testified that there were "inconsistencies that occurred throughout the interview," including changes to "[Copeland's] story as to the discipline that Ms. Saari used on [L.H.]" and his attempts to keep "removing himself" from the events. Initially, Copeland told Gibson that he had never seen Saari spank L.H.[5] "As the interview continued, he tended to want to blame [Saari]."[6]

After hearing the evidence, the jury convicted Copeland for injury to L.H., a child under the age of fourteen years. Copeland contends that the jury reached its verdict on legally insufficient evidence.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found that Copeland intentionally or knowingly caused serious bodily injury to L.H. beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the

---

[4]There is testimony that Saari did not show much emotion during the ordeal.

[5]Saari testified that she disciplined L.H. by spanking her and issuing "timeout."

[6]The video-recorded interview was played for the jury.

*Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* Here, the State was required to prove that (1) Copeland (2) intentionally or knowingly (3) caused serious bodily injury (4) to a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 22.04 (a)(1), (c), (e) (West Supp. 2013). Copeland challenges only the first two requirements.

The trial court's jury charge contained a law of the parties instruction. "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. . . ." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011).

7

We first determine if the evidence was sufficient to establish that Copeland was either a perpetrator or party to the crime. The jury heard that only Saari and Copeland were present when L.H. sustained her injuries. During his video-recorded interview, Copeland told Gibson that he found L.H. outside, brought her inside, and woke Saari in the middle of the night. At that time, Saari noticed injuries to L.H.'s head and shoulder, but went back to sleep because L.H. was staring blankly and was not crying. Copeland was the only person awake during the time that L.H. sustained these injuries. Copeland was also awake when Saari woke up that morning. Saari witnessed Copeland spanking L.H. Shortly thereafter, L.H. began vomiting, and Saari noticed that "[t]he backs of her legs [were] very bruised . . . . And she had blotches around her eyes," a sign indicating that L.H. had been previously strangled.

When questioned, Copeland initially told Saari and Gibson of his belief that L.H. had opened a window and climbed outside. Copeland later agreed with Gibson that a fall from a window would not have caused the injuries sustained by L.H., which included signs of strangulation. The jury heard testimony that the window would have been extremely difficult for the child to open and that there was no evidence of any disturbance on the ground underneath the window. Yet, Copeland maintained that the window was open, but that he did not open it. Saari remained at L.H.'s bedside while Copeland failed to visit L.H. very much during her extensive hospitalization. Copeland told Saari "that he was going to go down for this whether he did it or not" and conducted an internet search for "what kind of sentence you would get for a child abuse

8

case." We find the evidence legally sufficient for a jury to determine that Copeland was the perpetrator of the crime.[7]

Next, we examine the mens rea element. "Injury to a child is result-oriented offense requiring a mental state that relates not to the charged conduct but to the result of the conduct." *Baldwin v. State*, 264 S.W.3d 237, 242 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (West 2011). "[I]nconsistent statements[ ] and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara*, 152 S.W.3d at 50. We have already discussed that Copeland's recollection of the open window and L.H.'s alleged fall was a story which the jury could have found to be highly suspect. A fact-finder may infer a culpable mental state from the accused's acts, words, and conduct as well as the surrounding circumstances. *Id.*; *Baldwin*, 264 S.W.3d at 242. L.H.'s injuries "from head to toe" placed her "near death." Doctors observed signs of strangulation and concluded that her body had been subjected to "high-force-type" blunt-force trauma. We conclude that the evidence was legally sufficient to establish that the acts causing L.H.'s grave injuries were conducted with knowledge by the perpetrator that the acts were reasonably certain to cause serious bodily injury to the two-year-old child.

We overrule Copeland's point of error relating to legal sufficiency of the evidence.

---

[7]At the very least, even if the jury believed that the injuries were inflicted by Saari, Copeland's spanking of L.H. on the morning of December 7 and his agreement to tell officers initially that the child had fallen out of a window and that he had never seen Saari spank L.H. were acts of concealment sufficient to support a finding of guilt as a party to the crime. *See Guevara v. State*, 152 S.W.3d 45, 51–52 (Tex. Crim. App. 2004).

9

## II. Copeland's Claim of Ineffective Assistance Fails

Copeland argues that his counsel was deficient in failing to hire an expert to "level the playing field" following Trujillo's and Cox's testimony regarding the severity of L.H.'s injuries and their probable cause. We employ the two-pronged *Strickland* test for determining whether a defendant received ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To establish ineffective assistance of counsel under the first *Strickland* prong, an appellant must first show counsel's performance was deficient to the extent that it fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687–88.

The *Strickland* test "'requires a case-by-case examination of the evidence.'" *Hart v. State*, 314 S.W.3d 37, 41 (Tex. App.—Texarkana 2010, no pet.) (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)). Allegations of ineffectiveness must be firmly founded in the record. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Hart*, 314 S.W.3d at 41 (citing *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002)); *Wallace v. State*, 75 S.W.3d 576, 589 (Tex. App.—Texarkana 2002), *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003). From the record received by this Court, which does not contain counsel's reasoning for failing to seek an expert to rebut the testimony of L.H.'s treating physicians, Copeland bears the burden of proving that counsel was ineffective by a preponderance of the evidence. *Goodspeed*, 187 S.W.3d at 392; *Thompson*, 9 S.W.3d at 813; *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984). Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of

providing an evaluation of the merits of the claim of ineffective assistance of counsel. *Thompson*, 9 S.W.3d at 813. "In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect" the reasoning of trial counsel. *Id.* at 813–14. As demonstrated below, this is such a case.

Copeland's brief fails to inform this Court how expert testimony could have aided him. Counsel could have concluded that a non-treating expert was unnecessary or would not have been able to combat the testimony of L.H.'s treating physicians. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action could be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Therefore, we will not second-guess the strategy of Copeland's counsel at trial through hindsight. *Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979); *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.—Texarkana 2005, pet. ref'd).[8]

The second *Strickland* prong (the prejudice prong) requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome, meaning that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial with reliable results. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009).

---

[8]We note that failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006).

11

Doctors Trujillo and Cox testified extensively about L.H.'s injuries, which were documented in medical records and in photographs shown to the jury. There is no suggestion that an expert would argue with the physical evidence, which included signs of strangulation. In Copeland's video-recorded interview, even he expressed doubt that a fall from the window could cause L.H.'s extensive injuries. Copeland's brief fails to analyze *Strickland*'s second prong or otherwise establish how an expert for the defense could have undermined confidence in the outcome of the case.

We overrule Copeland's point of error complaining of ineffective assistance.

## III.     It Was Harmless Error to Admit the Facebook Posts

Copeland posted many mindlessly obscene Facebook status updates, which the State sought to admit, including one post on August 4, 2011, declaring, "[I] like kicking poor helpless things," and another on September 6 stating, "God dam [sic] kids taking my candy I will f*** a kid up." Copeland's counsel lodged a relevance objection and argued that the probative value of the posts were substantially outweighed by unfair prejudice. The State believed the first post was relevant because "the indictment alleges that a poor, helpless thing was kicked," and that both "extraneous references" were relevant to show Copeland's state of mind. Following this explanation, Copeland's counsel stated,

> Judge, Mr. Grogan is submitting these things for the defendant's state of mind for his argument, and the Defense urges the Court that these are being offered to prove the defendant's character acting in conformity, and we would object to that.
> Additionally, we ask the Court to do a balancing test on the prejudicial versus probative value. We would say that these items are very prejudicial in this case. They don't have anything to do with -- with injuring a child.

> If the Court does decide to allow this or some of the things in, we would ask the Court to make a finding of fact and conclusions of law, also a limine instruction as to what the jury can use these things for.

The trial court admitted these posts because they "certainly go to his state of mind, his intent, his motive, his plan, his opportunities, considering this is an alleged child abuse case, his outlook regarding children and his plan."[9]

We review for abuse of discretion a trial court's admission or exclusion of extraneous-offense evidence. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if the decision to exclude evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g); *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's decision on the exclusion of evidence is supported by the record, there is no abuse of discretion, and the trial court will not be reversed. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379. Further, a trial court's decision regarding admissibility of evidence will be sustained if correct on any theory of law applicable to

---

[9]The trial court's written findings of fact and conclusions of law stated that the Facebook posts "go towards the Defendant's state of mind, opportunity, motive, intent, *before the alleged crime was* committed." (Emphasis added). At trial, the court issued the following limiting instruction:

> THE COURT: Ladies and Gentlemen, you will receive a couple of different statements in evidence in regard to State's Exhibit No. 5 and No. 6. Those are for your purpose on how to consider those.
> However, you're governed by the following limine instruction: Those statements are -- can be used by you to consider, if they do, in fact, go to the motive, plan, opportunity, and intent of the defendant in the alleged perpetration of the crime.

the case, even when the court's underlying reason for the decision is wrong. *Romero v. State*, 800 S.W.2d 539, 543–44 (Tex. Crim. App. 1990).

"Evidence of a person's character or character trait is not admissible for the purpose of proving action in conformity therewith on a particular occasion . . . ." TEX. R. EVID. 404(a). As a general rule, to prevent an accused from being prosecuted for some collateral crime or misconduct, the State may not introduce evidence of bad acts similar to the offense charged, even if relevant. Extraneous-offense evidence is showing a crime or bad act and showing the defendant was connected to it. *Castillo v. State*, 59 S.W.3d 357, 361 (Tex. App.—Dallas 2001, pet. ref'd) (citing *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992)). The evidence must include some sort of extraneous conduct on behalf of the defendant forming part of the alleged extraneous offense. *Id.* (citing *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993)). "Absent any actual conduct involved which alone or in combination with such thoughts could constitute a bad act, wrong, or crime, a defendant's comments about a desire or intent to commit an offense do not constitute prior misconduct and, therefore, do not implicate rule 404(b)." *Id.* (citing *Massey v. State*, 933 S.W.2d 141, 154 (Tex. Crim. App. 1996)). "Statements concerning a defendant's thoughts of wrongdoing are merely inchoate thoughts." *Id.* (citing *Moreno*, 858 S.W.2d at 154). We hold that Copeland's Facebook posts fall within this category.

Because Rule 404(b)'s exception did not apply to the Facebook posts, we decide whether they were otherwise admissible. Only relevant evidence is admissible. TEX. R. EVID. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of

14

consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401.  The Facebook post on August 4, 2011, declaring, "[I] like kicking poor helpless things" was made around the time that Copeland and Saari met, but prior to Copeland moving into Saari's home.  The September 6 post stating, "God dam [sic] kids taking my candy I will f*** a kid up" was made after Copeland's move.  The State argues that the posts were admitted to show Copeland's "state of mind when it comes to kids."  We find that Copeland's posts regarding his attitude toward children were relevant in this case, although attenuated.[10]

However, to be admitted over Copeland's objection, the evidence must also meet the requirements of Rule 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."  TEX. R. EVID. 403.  "'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence."  *Gigliobianco v. State*, 210 S.W.3d 637, 640 (Tex. Crim. App. 2006).  We find that these Facebook posts, which do not specifically refer to L.H. and were made months before the incident, have very little probative value.

Further, when "the proponent [of an item of evidence] has other compelling or undisputed evidence to establish the proposition or fact that the [item of evidence] goes to prove,

---

[10]Character evidence is relevant, but not admissible to prove conduct.

15

the [probative value of the item of evidence] will weigh far less than it otherwise might in the probative-versus-prejudicial balance." *Id.* at 641 (quoting *Montgomery*, 810 S.W.2d at 390). Here, the State had evidence that Copeland spanked L.H., was present during the incident, fabricated the story about L.H. falling out of a window, conducted an internet search on the punishment range for injury to a child, told Saari that he would be held responsible, and gave inconsistent statements to the police. Thus, the State did not need to seek admission of the Facebook posts to show Copeland's state of mind.

"The rule's second key phrase, 'unfair prejudice,' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (citing *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999); *Montgomery*, 810 S.W.2d at 389). "Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence." *Id.* (citing K. Broun, et al., *McCormick on Evidence* § 185 at 737 (6th ed. 2006)). During closing argument, the State asked the jury to consider, "What kind of a person [could make such statements?]" and concluded the answer to be, "A guilty person." The introduction of the Facebook posts was designed to arouse the jury's hostility toward Copeland. While the August and September Facebook posts marginally provide some evidence of Copeland's general attitude towards children, it is not logical to link these specific posts to his intent or state of mind as to the incident in December.

The probative value of the Facebook posts is slim. On the other hand, the danger of unfair prejudice is high because we believe the evidence was admitted to demonstrate

16

Copeland's character and to instill hostility towards him in contravention of Rule 404(a). Thus, we find that the posts' probative value was substantially outweighed by the danger of unfair prejudice. The Rule 403 objection should have been sustained.

While we find that the admission of the Facebook posts was erroneous, we deem the error harmless. Error in the admission of evidence constitutes nonconstitutional error that is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Under Rule 44.2(b), any nonconstitutional error that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A conviction should not be overturned for such error if this Court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002).[11]

In a trial record of over 300 pages, the presentation of this evidence, which consisted merely of Saari reading the Facebook posts, consumed less than half a page. While the State referred to the posts in its closing argument, Copeland's counsel responded,

> In talking about the Facebook, there's been -- the prosecutor has talked about the Facebook a lot, about hurting, you know, poor, defenseless things. These are kids, folks. They put stupid things on Facebook. Millions of people are on Facebook. Millions of people put stupid things on Facebook.

---

[11]In assessing the likelihood that any error adversely affected the jury's decision, we consider the entire record, "including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Given the strength of the evidence discussed above, which established Copeland's guilt as the perpetrator of the crime (or at the very least, as a party to the crime), we cannot say that the Facebook posts had a substantial and injurious effect or influence in determining the jury's verdict. The error was harmless.

## IV.   Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice


Date Submitted:     November 26, 2013
Date Decided:       December 5, 2013

Do Not Publish