

# IN THE
# TENTH COURT OF APPEALS

## No. 10-07-00043-CR

ROY ALTON SHAW,

                                                            Appellant

v.

THE STATE OF TEXAS,

                                                            Appellee

### From the 18th District Court
### Johnson County, Texas
### Trial Court No. F40536

## O P I N I O N

After his eight-year-old niece made an outcry to her mother that her great-uncle, Appellant Roy Shaw, had inappropriately touched her, an investigation brought forth allegations by three other female relatives that Shaw had committed sexual offenses against them as well. Shaw was eventually charged by indictment with nineteen felony counts. A jury found him guilty on Counts Two and Nineteen, each of which alleged indecency with a child by contact, and not guilty on the remaining counts. The jury assessed a three-year prison sentence and a $5,000 fine on Count Two; on Count

Nineteen, the jury assessed a ten-year sentence and a $10,000 fine but recommended that the sentence and fine be probated. Shaw appeals, asserting three issues. We will affirm.

## Sufficiency of the Evidence

We begin with Shaw's second and third issues, which respectively challenge the factual and legal sufficiency of the evidence on both indecency-by-contact convictions. A person commits the offense of indecency with a child "if, with a child younger than 17 years and not the person's spouse, . . . the person . . . engages in sexual contact with the child or causes the child to engage in sexual contact." TEX. PEN. CODE ANN. § 21.11(a)(1) (Vernon 2003). Sexual contact means the following, if committed with the intent to arouse or gratify the sexual desire of any person: "any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person." *Id.* § 21.11(c)(2).

### *Standards of Review*

When reviewing a challenge to the legal sufficiency of the evidence to establish the elements of a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The standard is the same for both direct and circumstantial evidence cases. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex. Crim. App. 1999). We do not resolve any conflict of fact or assign credibility to the witnesses, as this was the function of the trier of fact. *See Dewberry v.*

*State,* 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *Adelman v. State,* 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). Instead, our duty is to determine if the findings of the trier of fact are rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman,* 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In a factual sufficiency review, we ask whether a neutral review of all the evidence, though legally sufficient, demonstrates either that the proof of guilt is so weak or that conflicting evidence is so strong as to render the factfinder's verdict clearly wrong and manifestly unjust. *Watson v.* State, 204 S.W.3d. 404, 414-15 (Tex. Crim. App. 2006); *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact." *Johnson,* 23 S.W.3d at 7 (quoting *Jones v. State,* 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)). The appellate court "does not indulge in inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes a predominantly intuitive judgment. . . ." *Id.* (quoting William Powers and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEXAS L. REV. 515, 519 (1991)). The nature of a factual sufficiency review authorizes an appellate court, although to a very limited degree, to act as the so-called "thirteenth juror" to review the factfinder's weighing of the evidence and disagree with the factfinder's determination. *Watson,* 204 S.W.3d at 416-17.

*Count Two Evidence*

In Count Two, Shaw was charged with committing the offense of indecency with a child by contact against "JoAnn,"[1] Shaw's grand-niece who was around eight years old at the time of the offense. JoAnn, a nine-year-old fourth grader at the time of trial, testified that she and her two siblings had previously lived with Roy and Brenda Shaw, her aunt and uncle who lived "down the street." She said that while her brother and sister were cleaning a bedroom on the opposite end of the Shaws' trailer and Brenda had gone to the store, Shaw took her into his bedroom and had her take her clothes off and get on the bed. Shaw, while holding her down and dressed only in pants, then touched her with his hand on the outside of her private parts (her "tee-tee" and her "hiney bo"). On that occasion, she was probably in the second grade and it happened after Christmas; she was either six, seven, or eight years old. She also said that Shaw did the same thing to her "a few more times." Shaw's touching her made her feel "bad" and he told her that if she told anyone about it, he would whip her. JoAnn repeated several times that the things that Shaw had done to her really happened, and she said that no one, including her mother, had told her to say things about Shaw that were not true.

JoAnn's videotaped interview was shown to the jury. JoAnn admitted that in her videotaped interview she said that Shaw's fingers went inside her, but she does not remember that happening.

---

[1] The indictments used pseudonyms for the four victims. We have added a pseudonym for the minor victims' mother, "Brooke," to further protect their anonymity and also because Brooke alleged at trial that Shaw had molested her when she was a child.

The first person whom JoAnn told about Shaw's conduct was her mother, "Brooke." JoAnn admitted that Brenda approached her once and that she told Brenda that she was lying about what she had said Shaw had done to her, but JoAnn testified that she was lying to Brenda. JoAnn also told her grandmother and another aunt (Janice) that she was lying when Brenda had approached her and got her to say that she had lied about what Shaw had done. JoAnn denied telling Brenda that Brooke had asked her to lie about Shaw: "My mom didn't tell me to lie about Roy."

"Janice," Brooke's half-sister, recounted JoAnn's encounter with Brenda, saying that it happened at her mother's house. Brenda showed up, came storming in without knocking, and said she needed to talk to JoAnn. Brenda sat with JoAnn on the couch and talked to her and then brought JoAnn in the kitchen. JoAnn was crying, and Brenda told her to say to Debbie (Brenda's sister and Janice's mother) what she had just said. JoAnn said, "I lied." Brenda said, "Well, that's all I need. I'm going to talk to my lawyer now." Janice then talked to JoAnn, who was still crying, and told her that Shaw had done the same thing to her when she was a child and had spent the night at the Shaws' house. (Shaw's alleged offenses against Janice were Counts Thirteen, Fourteen, and Fifteen, asserting indecency with a child by contact. He was acquitted on those counts.) Janice asked JoAnn why she just said that she had lied, and she said that Brenda had told her to do so. Janice said that JoAnn then confirmed that Shaw had touched her.

JoAnn told her mother about Shaw's touching her after she went back to live with her. JoAnn testified that she started talking about it because she "just wanted to

tell [Brooke] it." Brooke testified that on March 25, 2005, after JoAnn had gotten out of the shower and was wrapped in a towel, she told JoAnn: "I love you very much and if anyone ever hurts you, I want you to know that I will protect you." She said that JoAnn's demeanor changed:

> She put her finger in her mouth. I remember this part perfectly. And she put her finger in her mouth and she put her head down and her eyes started to water. And I said, "What's wrong?" And she said, "He said if I told anyone he would whoop me." And I said, "Who"? And she said, "Roy."

Brooke then asked if Shaw touched her, and JoAnn said that he had touched her "privates." Brooke called the Johnson County Sheriff's Department and Laura McWhorter, a friend, to be with the children while she spoke to the responding officer. Brooke wrote a statement for the responding officer that day, and she admitted writing in the statement that JoAnn had told her that what Shaw had done had happened "on the couch." She confirmed that JoAnn had said it happened on the couch. She also admitted that, in trying to get details from JoAnn, she asked her how many times it had happened: "One, two, three, four, five times?" And JoAnn answered, "yeah, four or five times."

Brooke testified that her three children had been living with the Shaws from about November of 2004 to February of 2005. Brooke's mother Debbie is Brenda's sister. She admitted that she was on probation for forgery and DWI. She also admitted that the Shaws had taken care of her children "for free," that Shaw had tired of her "dumping" her kids at his house, and that Shaw disapproved of her lifestyle and that she "had dated out of her race." Brooke also admitted that a motion to adjudicate had

been filed against her on March 23, 2005, but she said that her report to law enforcement about Shaw was not done to curry favor with the State in her probation matter. Rather than being revoked, her probation was amended.

Brooke admitted that while on probation, she committed and pled guilty to felony intoxication assault and received probation again, but she also served 120 days in jail as "overnights." While serving that time, she reported that Shaw had penetrated her female organ with his fingers and had fondled her when she was a young teenager. In spite of that allegation, Brooke admitted that she had thought the Shaws' home was a safe place to leave her children and that she had told CPS that as well. She also admitted that she did not reveal Shaw's offenses against her when she reported the offenses against JoAnn, saying that she had not mentioned it before because she thought the statute of limitations had run, but she had told her grandmother about it soon after it happened.

Don Beeson, a former detective in the crimes-against-children unit of the Johnson County Sheriff's Department, investigated JoAnn's outcry. He made arrangements for her to be interviewed at the advocacy center and for both JoAnn and Debra to be interviewed at Cook's hospital in Fort Worth. In early April, Beeson called Shaw to come in and talk to him about an allegation of a sexual offense that Shaw had committed. When Shaw came in, Beeson gave Shaw his *Miranda* rights even though he was not in custody and wrote a statement for Shaw that Shaw signed. The statement says that he and his wife Brenda have raised Brooke's three children "on and off" for the past twelve years, that he has never touched either girl in a sexual way, and that to

his memory he has never been left alone with them. During their meeting, Shaw never offered Beeson a reason why Brooke would have gotten her two daughters to make false allegations against him. Beeson was trained in how to spot false allegations by children, and he did not see any in this case.

Beeson also asked Shaw if he would agree to meet with Bobby Jones, a forensic interviewer, and Shaw agreed. Beeson drove Shaw to that interview in July, and on the way back Shaw started talking out loud to himself and then volunteered that he had had a problem with alcohol and didn't drive, and that there were times when he would drink too much and would not be able to remember the previous evening. In the course of Beeson's investigation, two other female relatives came forward with allegations that Shaw had committed sexual offenses against them when they were minors: Janice, Shaw's adult niece, and "Teresa," Shaw's adopted daughter.

Beeson admitted on cross-examination that it appeared that Brooke had elicited JoAnn's outcry, that Brooke's interrogation of JoAnn was not done under the protocols of how law enforcement would have interviewed JoAnn, that he did not investigate whether Brooke had a motive or agenda or a bias to have such allegations made against Shaw, and that to his knowledge JoAnn and her sister "Debra" were with their mother from the time of JoAnn's outcry to the time of their advocacy center interviews. Beeson also acknowledged that he did not investigate the other men whom JoAnn and Debra had been around.

Virginia Caldwell, a registered nurse and trained sexual assault nurse examiner, performed sexual assault exams on JoAnn and Debra. JoAnn told Caldwell that Shaw

("Roy, my uncle") had touched her on her genital and anal areas with his hand more than one time. Caldwell's physical exam of those areas was normal, which was not surprising. Caldwell said that the relevant literature reports that the percentage of false allegations of sexual abuse among all victims is less than one percent. On cross-examination, Caldwell admitted that an authority figure such as a parent can induce a memory of something that didn't happen with a child.

Karen Rayburne, a licensed social worker and CPS investigator with the Department of Family and Protective Services, specializes in child sexual abuse. She testified that outcries by children generally are not spontaneous and usually something triggers an outcry, such as questioning by a parent about touching. Both Rayburne and Caldwell said that it is common for children to initially disclose only part of the abuse and to provide more or different information over time and to different people. Rayburne said that it is common for children to recant, that recantation is most common in a family setting, that family conflict and pressure can cause recantation, and that spontaneous recantations are different than recantations upon questioning. As a result of the allegations against Shaw, a CPS safety plan was implemented that prevented Shaw from having contact with Brooke's children, so she could no longer leave them with the Shaws.

Rayburne investigated Shaw's alleged sexual abuse of JoAnn and Debra, including interviewing Brooke and Brenda, and she did not discover any reason why Brooke would be lying about her children's allegations or that they had been pressured to make false allegations. She interviewed "Dale," the girls' older brother, who was

with them when they stayed with the Shaws, and he had no knowledge of any sexual abuse against the girls. Rayburne admitted that a parent or authority figure can pressure a child to make a false allegation, that a parent with a motive can be behind the false allegation, that sometimes an investigation will not uncover that motive, but that usually the motive is discovered.

The defense presented numerous witnesses (relatives and neighbors) who testified about Brooke's reputation for dishonesty and bad lifestyle and about Shaw's good character. Brenda testified that her relationship with Brooke initially was good but that once Brooke started having children, she would dump her kids on the Shaws and not return for several days. Brenda said that Brooke accused Shaw of molesting JoAnn when she was two years old when Brooke was angry after Shaw had made Brooke's boyfriend leave the Shaw's pool.

Brenda said that Brooke's children began staying with them in November of 2004 because Brooke was in jail for two weeks, and when she got out of jail, she did not get them back, although she would drop by to visit. The girls were never left alone with Shaw because he did not want to babysit them, and if Brenda went to the store, the girls always went with her. She testified about her numerous back surgeries, back pain and use of pain medication, and the related difficulties with caring for children.

She and Shaw got "fed up" with Brooke's leaving her kids with them while she got to "run around" while they had to care for her kids, and in January they sent the children to Brooke's mother's (Debbie's) house, where Brooke was staying. The Shaws told Debbie and Brooke that they would no longer keep Brooke's three kids. Brenda

recounted that after JoAnn's outcry, she ran into JoAnn and Debra with their grandmother Debbie at Wal-Mart, and while JoAnn was alone with her, she asked her if Shaw had "messed with her," and JoAnn put her head down. Brenda then recounted the occasion at Debbie's house where she asked JoAnn to tell Debbie what JoAnn had told her at Wal-Mart.

Shaw testified; he denied all the allegations against him, including Brooke's allegation that he had molested JoAnn when she was two. He related his problems with Brooke's boyfriends' stealing things and her leaving her kids with them. He denied ever being alone with JoAnn or Debra, and he explained that the children were a difficulty on Brenda because of her back problems. He confirmed that Brooke's three kids stayed with them from November of 2004 to January of 2005, and he was never alone with JoAnn or Debra in that time frame either. In January he told Brooke that he "was tired of her dumping the kids off on us."

Shaw said he freely went to talk to Beeson without a lawyer because he had not done anything wrong. When he talked to Jones, he was nervous and scared and that Jones asked him if a lot of things were "possible." He denied drinking so much that he could not remember the day before, but he said he told Jones it was "possible," but it had never happened. He admitted to telling Beeson that he had sometimes drank too much, but he did not remember telling him that he drank so much he couldn't remember what had happened. Shaw also admitted that he did not tell Beeson about Brooke's first false allegation or about telling Brooke that he wouldn't keep her kids anymore and she thus "had an ax to grind" with him. Shaw also admitted telling Jones

that it was possible that he may have accidentally touched the girls while bathing them or playing with them. Jones asked him if it was possible that he got so drunk that he touched JoAnn's genital area, and Shaw said he told Jones it was "possible," but he did not do it.

In the State's rebuttal, Lauren McWhorter, a social worker and Brooke's friend since grade school, confirmed that Brooke had called her the day of JoAnn's outcry. She received a call from Brooke, who was very upset and crying and told her the situation that had just occurred with JoAnn's outcry. McWhorter said to call the police and she immediately went to Brooke, who was at Debbie's house. When she arrived Brooke was crying and upset. McWhorter stayed outside with the kids while Brooke spoke with the responding officer, whose patrol car was parked in front of Debbie's house. While they were outside, Brenda drove up and the first thing she said to McWhorter was "did somebody touch the girls?," which McWhorter found curious. McWhorter confirmed Brooke's bad qualities and poor choice in men and that she did not have a good opinion of Brooke's truthfulness.

Bobby Jones, the forensic interviewer, testified in rebuttal about his interview with Shaw, stating that Shaw admitted that he had changed JoAnn's diapers when she was an infant and he had touched her genital area then and when he had bathed her, but not sexually. He also told Jones that, about six months before their interview, JoAnn had slipped and fallen in the bathtub and he was in the bathroom and when he grabbed her, it was possible he may have touched her genital area. Shaw also brought up to Jones that it was "very possible" that, while playing with JoAnn and tossing her

in the air, his hand slipped into her underwear and he touched her genital area, and he also indicated that he played a game with JoAnn where he flipped her over and his hand may have gone up her shirt and touched her breast. Shaw told Jones about a time when both girls were taking a bath and a mouse got in the tub, and in trying to get the mouse, Shaw might have touched JoAnn's genital area. While he admitted possibly touching JoAnn, he denied that he ever touched her sexually.

Finally, Jones said that Shaw told him it was possible he had drank too much and touched JoAnn and didn't remember because "a time or two" he had gotten drunk and couldn't remember what he had done. Shaw gave Jones an example of being drunk and waking up the next day to learn that a taco he had put in the refrigerator was gone because he had eaten it the night before but did not remember eating it.

*Count Two Disposition*

With respect to the jury's guilty verdict on Count Two involving JoAnn, a minor complainant's testimony alone is sufficient to support a conviction for indecency with a child. *See Abbott v. State,* 196 S.W.3d 334, 341 (Tex. App.—Waco 2006, pet ref'd). In addition to JoAnn's testimony and her videotape, the jury heard the outcry testimony from Brooke and Caldwell's similar testimony. JoAnn's versions of the offenses were inconsistent, but Caldwell and Rayburne said that was normal and common for child victims. And while JoAnn recanted to Brenda, she immediately claimed that her recantation was a lie. Also, while Brooke's reputation for truthfulness was impugned, JoAnn's was not. Shaw denied the allegations and had numerous character witnesses testify on his behalf, but he made near-incriminating statements to Jones.

On Shaw's legal sufficiency complaint on Count Two, our duty is to determine if the jury's guilt finding is rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict, and we do not resolve any conflict of fact or assign credibility to the witnesses, as this was the jury's function. Viewing the evidence in the light most favorable to the verdict, we find that a rational trier of fact could have found beyond a reasonable doubt that Shaw committed the offense alleged in Count Two.

In our factual sufficiency review of the jury's guilt finding on Count Two, we conduct a neutral review of all the evidence to determine if the proof of guilt is so weak or that conflicting evidence is so strong as to render the jury's verdict clearly wrong and manifestly unjust. Shaw primarily posits that the jury's acquittal on seventeen of the nineteen counts is an integral factor in our factual sufficiency review. We disagree. The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 670 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981)). The jury may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jaggers*, 125 S.W.3d at 670. Furthermore, most of the seventeen acquittals were the counts pertaining to Janice and Teresa, who were adults whose allegations against Shaw were made many years after the alleged offenses occurred, whereas JoAnn's and Debra's allegations were made within a couple of months. Under those plainly different circumstances, a jury rationally could have found that JoAnn's and Debra's allegations pertaining to Counts

Two and Nineteen were proved beyond a reasonable doubt, while the allegations involving Janice and Teresa were not.

The jury was faced with conflicting evidence. As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State,* 67 S.W.3d 229, 236 (Tex. Crim. App. 2002); *see also Sharp,* 707 S.W.2d at 614; *Jaggers,* 125 S.W.3d at 670.

> The degree of deference a reviewing court provides must be proportionate with the facts it can accurately glean from the trial record. A factual sufficiency analysis can consider only those few matters bearing on credibility that can be fully determined from a cold appellate record. Such an approach occasionally permits some credibility assessment but usually requires deference to the jury's conclusion based on matters beyond the scope of the appellate court's legitimate concern. *See* GEORGE E. DIX & ROBERT O. DAWSON, 42 TEXAS PRACTICE—CRIMINAL PRACTICE AND PROCEDURE § 36.69 (Supp. 1999). Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered.

*Johnson,* 23 S.W.3d at 8.

We must defer to the jury's determination concerning what weight to give the contradictory testimonial evidence. *See, e.g., In re A.B.,* 133 S.W.3d 869, 873-74 (Tex. App.—Dallas 2004, no pet.); *Scugoza v. State,* 949 S.W.2d 360, 362-63 (Tex. App.—San Antonio 1997, no pet.); *Fetterolf v. State,* 782 S.W.2d 927, 933 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd); *see also Johnson,* 23 S.W.3d at 7-8. Considering all of the evidence in a neutral light, we find that the jury was justified in finding Shaw guilty on Count Two because the evidence is factually sufficient: The proof of guilt is not so weak and

the conflicting evidence is not so strong as to render the jury's verdict clearly wrong and manifestly unjust.

*Count Nineteen Evidence*

In Count Nineteen, Shaw was charged with committing the offense of indecency with a child by contact against Debra, Shaw's grand-niece who was around six years old at the time of the offense. In addition to the above evidence, the evidence showed that at the time of trial, Debra was an eight-year-old second grader, and she testified that she had previously lived with the Shaws. She said that when she lived with the Shaws, Shaw touched her private parts under her clothing (a nightgown) and underwear—her "tee-tee," "hiney bo," and "boobies," and his fingers went inside of her. He did it while she and Shaw were lying on the living-room couch on their sides (with Shaw behind her) under a blanket, and they were watching the "Grinch," a Christmas movie, around Christmastime. JoAnn was there, but she was sitting on the floor in front of the television, and Brenda was there but was either cooking in the kitchen or cleaning the bathroom.

Debra said that the first person she told about it was her mother on the next day, and JoAnn was there when she told her mother about it. She later said she didn't remember telling her mother what Shaw had done. Debra's videotaped interview was shown to the jury. Like JoAnn, Debra's versions of her allegations against Shaw were inconsistent.

Brooke said that after JoAnn's outcry, she asked Debra if anything had happened to her, and she said, "no, I don't want to talk about it." When Brooke took JoAnn to the

advocacy center to be interviewed, Debra went with them. While they were there, Brooke told Debra that if she needed to say anything, "now is the perfect time for it," and Debra hesitantly said that Shaw had touched her breasts in the Shaws' living room while Brenda was in bed or not there. She also told Brooke that Shaw often would lay on the couch with her. Brooke then told an advocacy center employee that Debra had something to say.

Brooke admitted that when she brought up the subject with Debra, she asked her if Shaw had touched her. She denied telling Debra to say that they were watching the "Grinch" when it happened.

Debra told Caldwell that "Roy" touched her private part by putting his hand in her panties, that he did it lot, and that sometimes it hurt. Caldwell's genital/anal exam of Debra was normal. Caldwell did not think that Brooke's initial questioning of Debra by asking if Shaw had done anything to her was inappropriate because JoAnn had already alleged that he had touched her. Debra did not report to her that Shaw had touched her breasts.

### Count Nineteen Disposition

We find that the evidence is legally and factually sufficient on the jury's guilt finding on Count Nineteen for essentially the same reasons set forth in our discussion on Count Two.

Shaw's second and third issues are overruled.

## Exclusion of Evidence

Shaw's first issue complains about the trial court's exclusion of evidence that a

boyfriend of the victims' mother was a registered sex offender. We review a trial court's admission or exclusion of evidence for abuse of discretion. *McDonald v. State,* 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). Questions of relevance should be left largely to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion. *Moreno v. State,* 858 S.W.2d 453, 463 (Tex. Crim. App. 1993). "A trial court abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.*

Various witnesses, including Brooke and her two daughters, testified about the various men whom Brooke had been involved with or lived with and her children had thus been exposed to. One was Glen Walker, a registered sex offender. The jury heard evidence from the two girls that they had been around Walker and, with their mother and brother, had stayed overnight some at Walker's residence, and several witnesses said that the girls should not have been around Walker. But the trial court excluded evidence that Walker was a registered sex offender on the State's objections that it was not relevant and, if relevant, was more prejudicial than probative and was confusing. In an offer of proof, Shaw's counsel elicited evidence from Rayburne that Walker was a registered sex offender.

Shaw's brief does not explicitly explain the relevance of Walker's registered-sex-offender status. He argues that "there is little doubt that the probative value of Walker's contact with the children in this case could have undermined the State's case," but his brief does not explain why. Moreover, the jury heard numerous witnesses say that JoAnn and Debra were around Walker. We therefore assume that Shaw's relevance

argument is premised on Walker's being an alternative perpetrator of the offenses alleged by the children.

"Evidence which is not relevant is inadmissible."  TEX. R. EVID. 402.  Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Id.* 401.  "A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule."  *Miller v. State,* 36 S.W.3d 503, 507 (Tex. Crim. App. 2001) (citing *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)).  Evidence is considered relevant if it is material and probative.  *Id.*  To be material, the evidence "must be shown to be addressed to the proof of a material proposition, *i.e.,* 'any fact that is of consequence to the determination of the action.'"  *Id.* (quoting 1 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 401.1).  Evidence is considered probative if it "tend[s] to make the existence of the fact 'more or less probable than it would be without the evidence.'"  *Id.*

It is axiomatic that in a criminal prosecution, the State must prove each element of the alleged offense beyond a reasonable doubt, and those elements are material issues in the prosecution.  *See Soffar v. State,* 742 S.W.2d 371, 377 (Tex. Crim. App. 1987) ("The material issues in a criminal prosecution always consist of the elements of the offense.").  But the identity of the accused is not an issue in every prosecution; the main issue can be whether an offense was committed at all.  *See, e.g., Eubanks v. State,* 113 S.W.3d 562, 566 n.1 (Tex. App.—Dallas 2003, no pet.); *Morris v. State,* 110 S.W.3d 100,

103 (Tex. App.—Eastland 2003, pet. ref'd). In this case, the identity of the perpetrator of the sexual offenses allegedly committed against JoAnn and Debra was not an issue. They both knew Shaw very well and unequivocally and consistently said that he committed the charged offenses against them. The main issue on the charges against Shaw was whether the offenses occurred at all.

Evidence of Walker's registered-sex-offender status would only have been relevant if the identity of the alleged perpetrator of the offenses was an issue in the case. But in this case, evidence of an alternative perpetrator, such as Walker, is not relevant, *i.e.*, is immaterial, to the determination of whether the alleged offenses occurred. *Cf. Turner v. State*, 600 S.W.2d 927, 933 (Tex. Crim. App. 1980). Therefore, we cannot say that the trial court abused its discretion in excluding evidence of Walker's sex-offender status on relevance grounds. We overrule Shaw's first issue.

## Conclusion

Having overruled all of Shaw's issues, we affirm the trial court's two judgments of conviction.


BILL VANCE
Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
Affirmed
Opinion delivered and filed December 3, 2008
Do not publish
[CR25]