

NUMBER 13-09-586-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

ROEL IBARRA,                                                              **Appellant,**

**v.**

THE STATE OF TEXAS,                                                       **Appellee.**

### On appeal from the 105th District Court
### of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Justices Garza, Benavides, and Vela**
**Memorandum Opinion by Justice Vela**

A jury found appellant, Roel Ibarra, guilty of aggravated sexual assault of a child,

*see* TEX. PENAL CODE ANN. § 22.021 (Vernon Supp. 2010), and injury to a child.  *See id.* §

22.04.   The trial court assessed punishment at concurrent sentences of sixty years' and

fifty years' imprisonment, respectively.   By five issues, Ibarra complains the trial court

erred in admitting evidence and that he received ineffective assistance of counsel.   We affirm.

## I. FACTUAL BACKGROUND

After Belinda Garza began dating Roel Ibarra, she and her two-year-old daughter, I.G., started living with him in his Corpus Christi apartment.   Garza testified that I.G. was born "with a lot of hair" and that on one occasion, Ibarra asked her to shave I.G.'s legs. She refused to do so.

In the evening of January 15, 2009, Garza changed I.G.'s diaper and bathed her. She saw no bruises on I.G.'s body and put her to bed at 8:00 p.m.   The next morning, she went to work, leaving I.G. in Ibarra's care.   Later that day, Ibarra took I.G. to Thomas De Los Santos's apartment.   When Garza's brother, Orlando Ramirez, arrived, Ramirez and De Los Santos took Ibarra to two pawn shops.   During that time, I.G. stayed at the apartment with De Los Santos's girlfriend, Melissa Mazzella.   Ramirez testified that while they were driving to the pawn shops, Ibarra told him "that he hadn't had sex in a while and that he wasn't used to that kind of thing."

Garza testified that when she arrived at De Los Santos's apartment that evening, Ibarra told her "to get some diaper rash cream because [I.G.] had a diaper rash."   When Garza checked I.G. for the rash, she saw "redness" on I.G.'s "stomach area."   She and Ibarra took I.G. to Driscoll Children's Hospital.

While Ibarra was at the hospital, a social worker, Brenda Loera, interviewed Ibarra about the environmental risks surrounding I.G.   When she asked him about "drug use," he told her "that his friends did smoke weed outside of the apartment and then they would

2

come inside [the apartment] after they did that, . . . ."

The next day, Dr. Nancy Harper, a pediatrician with subspecialty training in child abuse, examined I.G. and discovered numerous injuries to her body. She testified that I.G. had: (1) a small, circular bruise under the bony prominence of her chin; (2) small strangulation bruises on her neck; (3) bruising surrounding the back of the ear, meaning that her ear had been grabbed or pulled forcefully, or that there had been a blow to her head; (4) a bruise on the left lower part of her abdomen, indicating "direct trauma and impact or a blow to that belly;" (5) a bruise on the right lower side of her abdomen or stomach with another bruise closer to the belly button, indicating "a direct blow" to the stomach or abdomen; (6) an injury to her liver; (7) a small, round bruise to her buttocks, which can indicate a "direct small impact" from fingertips; (8) "bruising on both sides of the labia" on her genital area; (9) "little bruises to the top of her hymen, to the bottom of her hymen, and also to the top of the wall of the vagina;" and (10) a large bruise on the left side of her scalp, caused by a blow to the head or forcible hair pulling. Dr. Harper stated that the bruise to I.G.'s abdomen was an "inflicted injury" that is "consistent with being "punched" or "kicked in her belly area." She also testified that the injuries to I.G.'s genital area resulted from either "a direct impact that also sort of penetrated between those labia and also hit the vagina or it could have been penetrating trauma from something of a more sexual nature."

Ibarra testified he took care of I.G. the weekend before January 16, 2009, which was the day Garza discovered I.G.'s bruises. On Monday, January 12, 2009, Garza showed him a "mark behind [I.G.'s] ear." This was the first time he had seen the mark,

3

and he did not know how I.G. received it. The next day, he did not see I.G. On Wednesday, he stayed at De Los Santos's apartment. That evening, Garza and I.G. came to the apartment. While Ibarra, Garza, and I.G. spent the night there, Ibarra "heard a little thump and a small cry." The next morning, Ibarra left for work and at 8:00 p.m. he returned to his own apartment. About an hour later, Garza and I.G. arrived at his apartment. At that time, Ibarra could not see if I.G. had any bruises. The following morning, Garza went to work. After she left, Ibarra fed I.G., got her dressed, and then took her to De Los Santos's apartment, arriving about 2:00 p.m. At some point, Ibarra, Ramirez, and De Los Santos went to some pawn shops. Ibarra returned to De Los Santos's apartment between 4:00 and 5:00 p.m. Ibarra testified that when Garza arrived at the apartment, she "grabbed [I.G.] and went straight behind the couch and she . . . let us know that [I.G.] had these marks on her." Ibarra testified he did not change I.G.'s diaper that day and did not tell Garza that I.G. had diaper rash. He stated that nothing happened between him and I.G. that morning and that he did not know how I.G. became injured.

## II. Discussion

### A. Admission of Evidence

We address issue three first wherein Ibarra argues the trial court erred by admitting, over defense counsel's objections, evidence of his extraneous bad acts and statements. *See* TEX. R. EVID. 404(b) (providing that evidence of other crimes, wrongs, or acts is "not admissible to prove the character of a person in order to show action in conformity therewith."). Specifically, he contends the trial court should have excluded:

4

(1) Ramirez's testimony that Ibarra "hadn't had sex in a while and that he wasn't used to that kind of thing"; (2) Loera's testimony that Ibarra's friends smoked weed outside his apartment and afterwards would come into the apartment; and (3) Garza's testimony that he told her she needed to shave I.G.'s legs.

### 1. Preservation of Error

Even though defense counsel objected to the admission of the complained-of statements and received adverse rulings, any error in the admission of the first two statements was harmless. We note that during Loera's cross-examination, defense counsel raised the issue of Ibarra's friends smoking weed. Specifically, defense counsel asked Loera, "[W]hen these friends are coming over, whoever is smoking marijuana, we don't know who those individuals are, do we?" She answered, "No." Next, defense counsel asked her, "We don't know the mother is present for that as well?" To this, Loera said, "No." During Ramirez's cross-examination, defense counsel asked him, "During this trip [to the pawn shops] you stated he [Ibarra] made some comment about him and Belinda [Garza] not having sex, is that right?" He answered, "Yes."

This Court has stated that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling. This rule applies whether the other evidence was introduced by the defendant or the State.'" *Reyes v. State*, 267 S.W.3d 268, 274 (Tex. App.–Corpus Christi 2008, pet. ref'd) (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)). Here, during cross-examination of Loera and Ramirez, defense counsel raised the issues of Ibarra's friends smoking marijuana and Ibarra not having sex. Thus, any

5

error in admitting the complained-of testimony of both Loera and Ramirez was rendered harmless because defense counsel brought up the same issues on cross-examination. *See Willis v. State*, 785 S.W.2d 378, 383 (Tex. Crim. App. 1989) (noting that admission of inadmissible evidence is rendered harmless if the same or similar evidence is introduced without objection elsewhere during trial).

Furthermore, with respect to Loera's testimony about Ibarra's friends smoking weed, article 38.37 of the code of criminal procedure provides that in assaultive and certain other offenses against children, "evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child." TEX. CODE CRIM. PROC. ANN. art. 38.37, § 2 (Vernon Supp. 2010). In this case, Loera's testimony regarding Ibarra's conduct of allowing his friends, who had just smoked marijuana, to come into his apartment in I.G.'s presence, shows Ibarra's state of mind concerning his duty to protect I.G.'s welfare and his previous relationship with I.G.

With respect to the admission of Garza's testimony that Ibarra asked her to shave I.G.'s legs, caselaw provides that to constitute an extraneous offense, the evidence must show a crime or bad act and must tie the accused to it. *Greene v. State*, 287 S.W.3d 277, 285 (Tex. App.−Eastland 2009, pet. ref'd) (citing *Lockhart v. State*, 847 S.W.2d 568, 573 (Tex. Crim. App. 1992)). The evidence must include some kind of extraneous conduct on the defendant's behalf that forms a part of the alleged extraneous offense.

6

*Id.* (citing *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993)). "Statements concerning a defendant's thoughts of wrongdoing are merely inchoate thoughts." *Id.* To implicate Rule 404(b) of the Texas Rules of Evidence, "there must be actual conduct that alone or in combination with these thoughts could constitute a bad act, wrong, or crime." *Id.* (citing *Massey v. State*, 933 S.W.2d 141, 154 (Tex. Crim. App. 1996)).

Ibarra's statement to Garza that she should shave I.G.'s legs pertained to his thoughts and did not implicate any conduct on his part that would invoke Rule 404(b). Moreover, his statement tends to show his attraction to I.G. or his thoughts about her in an adult or sexual manner and are highly relevant to his state of mind. *See id.* (stating that the evidence concerning the defendant's feelings towards the child victim and what he wanted to do to her did not implicate Rule 404(b) and "was relevant to, and highly probative of," his state of mind and the relationship between himself and the child during his trial for sexual assault of a child and indecency with a child). Issue three is overruled.

In issue four, Ibarra argues the trial court erred in allowing Detective David Perez, the lead investigator in this case, to testify about Belinda Garza's truthfulness. During the State's re-direct-examination of Detective Perez, the prosecutor requested permission from the trial court "to go into whether or not he [Detective Perez] thought the mother [Belinda Garza] was telling the truth." The trial court overruled defense counsel's objection, and the prosecutor asked Detective Perez a series of three questions. First, the prosecutor asked, "Without going into specifics, did you believe that the mother was telling the truth?" To this, he said, "Yes." Next, without objection, the prosecutor asked him, "Did you at any time feel that she was not?" To this, he said, "No." Third, without

objection, the prosecutor asked him, "Did anyone come forward at any time and tell you they felt she was not being truthful?", he said, "No."

In *Valle v. State*, the court of criminal appeals stated that "[t]o preserve error in admitting evidence, a party must make a proper objection and get a ruling on that objection. In addition, a party must object each time the inadmissible evidence is offered or obtain a running objection." 109 S.W.3d 500, 509 (Tex. Crim. App. 2003). In this case, defense counsel did not obtain a running objection and did not object to the prosecutor's second and third questions, both of which elicited testimony about Garza's truthfulness. Thus, appellant failed to preserve this issue for appellate review. *See id.* Furthermore, even if the trial court erred in overruling the objection, any error in admitting Detective Perez's testimony with respect to the first question was cured because the admission of inadmissible evidence is rendered harmless if the same or similar evidence is introduced without objection elsewhere during trial. *See Willis*, 785 S.W.2d at 383. In this case, the second and third questions to Detective Perez elicited the same or similar evidence that was elicited by the first question. Therefore, the testimony elicited by the second and third questions rendered harmless any error made by the trial court in overruling defense counsel's objection. Issue four is overruled.

In issue five, Ibarra argues that the trial court erred in allowing the State to elicit testimony from Detective Perez about rare instances when the perpetrator masturbated and left semen after fondling a child. During the State's re-direct-examination of Detective Perez, the prosecutor asked him, "[T]here was no semen found [in Ibarra's apartment], is that correct?" He replied, "We didn't search for any, no." Later, the

8

prosecutor asked Detective Perez, "Are there times based on your experience in cases you have handled where a defendant may masturbate after placing—". At that point, defense counsel objected based upon "relevance," and the trial court overruled the objection. Next, the prosecutor asked Detective Perez, "Have you found that sometimes a defendant will sexually assault a child and then masturbate to it after the occurrence?" To this, he said, "I haven't personally had a case like that, but that information has been taught to me." Then, the prosecutor asked him, "Okay, and how many cases do you have where semen is found but where there is a molestation?" To this, he said, "It happens, but it's kind of rare."

Rule 33.1 of the Texas Rules of Appellate Procedure governs preservation of error, and states, in part:

> (a) In General.-As a prerequisite to presenting a complaint for appellate review, the record must show that:
>
> (1) the complaint was made to the trial court by a timely request, objection, or motion that:
>
> (A) stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context;

TEX. R. APP. P. 33.1.

"The complaining party bears the responsibility of clearly conveying to the trial judge the particular complaint, including the precise and proper application of the law as well as the underlying rationale." *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005). In order to avoid forfeiting a complaint on appeal, "the party must 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough

9

for the judge to understand him at a time when the judge is in the proper position to do something about it.'" *Pena v State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). This method gives the trial court and the opposing party a chance to correct the error. *Id.* "Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial. In making this determination, we consider the context in which the complaint was made and the parties' shared understanding at that time." *Id.* (footnote omitted).

Here, defense counsel did not request a running objection and did not object to Detective Perez's testimony about rare instances where the perpetrator masturbated and left semen after fondling a child. Thus, the issue is not preserved for appellate review. *See* TEX. R. APP. P. 33.1; *Pena*, 285 S.W.3d at 464. Issue five is overruled.

## B. Ineffective Assistance of Counsel

### 1. Motion for New Trial

Ibarra's appellate counsel filed a motion for new trial, alleging ineffective assistance of counsel, which was denied by the trial court. The motion included several affidavits in support of the ineffectiveness claim. The affidavits are summarized as follows:

### a. Affidavit of Roel Ibarra

Prior to trial, Ibarra gave his trial counsel, Robert Flynn, the names of several witnesses to contact. He also wanted Mr. Flynn to call his family members, friends, six-year-old daughter, her mother, Stephanie Rios, and Stephanie's mother, Connie Rios,

10

to testify.   On the day of the verdict, Mr. Flynn asked Ibarra for the names of people he wanted to testify at the punishment phase.   Ibarra gave Mr. Flynn the names of the people he had already given him, plus Lorenzo Rios.   Mr. Flynn did not call these witnesses to testify at the punishment phase.

### b. Affidavit of Veronica Alvarado

Ibarra's mother, Veronica Alvarado, stated that Mr. Flynn did not ask her to testify as a character witness until the day of the verdict.   If she had known ahead of time that she was going to be asked to testify, she would have emotionally and physically prepared herself to testify.   The day before the verdict, Mr. Flynn asked her to contact Nicole Ibarra, Lorenzo Rios, and Stephanie Rios to testify.   Alvarado was not able to contact them on short notice.   She stated her son is a great, young father and a hard worker who has always been good with children.

### c.   Affidavit of Lorenzo Rios

Lorenzo stated he was available to testify and that nobody contacted him before or during the trial.   He would have testified that Ibarra is an honest and truthful person.   He lived with Ibarra and Belinda Garza from about October 2008 until early January 2009.   He never saw Ibarra abuse I.G. and claimed that when I.G. stayed with Garza's mother or sister, I.G. would come home with bruises.

### d. Affidavit of Stephanie Rios

Stephanie stated she lived with Ibarra and their daughter from December 2002 "off and on" until December 2008.   She was available to testify, but no one "on the defense side" ever contacted her.   She stated Ibarra never mistreated her or her daughter and

"that he was a peaceful and law abiding and honest person, who was a good father, . . . ."

### e. Affidavit of Connie Rios

Stephanie's mother, Connie, stated she was available to testify but was never contacted by Mr. Flynn. She would have testified that Ibarra lived with her and her daughter, Stephanie, and his and Stephanie's daughter "on and off" from December 2002 until early 2008. She stated Ibarra was "honest and truthful," "law abiding," and had a "good reputation."

### f. Affidavit of Suzette Lara

Lara, Ibarra's maternal aunt, stated she was available to testify but was never contacted by Mr. Flynn. Ibarra lived with her for a month in 2004 and during some of that time took care of her two children, who were seven and ten years old. Her children "had a very good relationship with" Ibarra. She stated he never abused her children and was never "inappropriate with them."

### g. Affidavit of George Loredo

Loredo, Ibarra's uncle by marriage, knew Ibarra for eighteen years and was available to testify. In reference to family gatherings and reunions, Loredo stated Ibarra "has always helped out with the other younger children and there have never been any indications from anyone that there was any abuse or signs of abuse from" him. He stated Ibarra "is a trusting individual and I trusted him with my children many times." On several occasions between 2004 and 2007, Loredo observed Ibarra with Stephanie Rios and their daughter. Loredo stated, "[t]here was never any indication of abuse or signs of abuse during the time I observed them."

### h. Affidavit of Annette Zundt

Zundt, Ibarra's maternal aunt, stated she was available to testify and that on the last day of the guilt-innocence phase, Mr. Flynn asked her to contact "Lorenzo Rios, Nicole Ibarra, Lorenzo's sister and Stephanie Rios" to testify. This was the first time Mr. Flynn asked her to contact these witnesses. Zundt was unable to contact these witnesses in such a short time and stated that all of these witnesses, except for Nicole, "would have been available to testify had they had prior notice, . . . ." Zundt would have testified that Ibarra "was a trustworthy person, of good character, a hard worker who lived with me for several months in 2005." She stated Ibarra played with her twelve-year-old son, and she saw no "indications of abuse or signs of abuse from" Ibarra.

The trial judge, who presided over Ibarra's trial, held a hearing on the motion for new trial, during which appellate counsel called only Ibarra as a witness.

Ibarra testified that during his first meeting with Mr. Flynn, he gave Mr. Flynn the names, addresses, and phone numbers of Lorenzo, Connie, and Stephanie Rios as well as his employer, Bill Hall. Ibarra expected either Lorenzo, Stephanie, or Connie to testify and said that even though Lorenzo was not living with him at the time of the incident in question, Lorenzo "pretty much was with me the whole time, . . . even during work, so he knows how I am with [I.G.] and he's pretty much there." He stated Lorenzo worked with him every day of the week of the incident in question and said Lorenzo "could have pretty much led the jury to pinpoint where [I.G.] was at." Ibarra stated that the week of the incident in question, I.G. was with her mother's relatives and that Lorenzo "could . . . have said . . . that the bruising would occur when the child [I.G.] stayed with relatives." He said

13

that with respect to punishment, Lorenzo knew his character and knew him to be "truthful."

Ibarra said that Stephanie, Connie, and his Aunt Annette could have testified as character witnesses. In addition, Stephanie could have testified about how he was "as a father." Ibarra testified that Connie could have testified about his relationship with Stephanie and how he raised Connie's granddaughter. Ibarra stated that towards the end of the guilt-innocence phase, Mr. Flynn asked Ibarra's Aunt Annette to "find the witnesses" whose names Ibarra gave to him.

Ibarra further testified that his mother, his Uncle George, and his Aunt Suzette were character witnesses. He stated that he "was around their children," lived with his Aunt Suzette for about a month, and baby-sat his Uncle George's children.

On cross-examination, Ibarra testified that Stephanie "wasn't around the week" of the incident in question. When the prosecutor asked Ibarra, "[Y]ou would agree with me that everyone that interacted with you or the victim [I.G.] that day [I.G.'s injuries were discovered] came in and testified?", he said, "Yes, . . . except for the manager in maintenance." However, Ibarra agreed with the prosecutor that the "manager in maintenance did not interact with [him] for very long if at all on that day in question." With respect to Ibarra's employer, Ibarra testified that his (Ibarra's) work schedule was not "an issue in this case[.]"

The State called Robert Flynn as its sole witness. Mr. Flynn practiced law for over twelve years, spending the first ten working for the district attorney's offices in Nueces and Kleberg Counties, where he prosecuted sexual-assault cases as well as other felony

14

cases. For the past year-and-a-half, he worked as a solo practitioner, representing felony defendants on many occasions.

Mr. Flynn testified that "the big issue" in Ibarra's case was "when did these injuries to [I.G.] occur?" He said that I.G. had numerous bruises and that based upon his "review of the experts," the red bruises were zero to forty-eight hours old and the purple and blue bruises were two to five days old. His strategy to exclude Ibarra as the perpetrator was to show that I.G.'s bruises occurred before the day Garza discovered them.

He stated that early in his representation of Ibarra, Ibarra gave him a list of witnesses. Mr. Flynn testified that after receiving the list, "I talked to Mr. Ibarra, we knew that they weren't going to be present. We knew they really weren't going to be of value, . . . at the trial because they couldn't really testify to anything. . . ." However, Mr. Flynn "considered that possibility they may be needed for punishment, . . . ." He said that "these witnesses were notified. . . . [T]hey all talked to each other, . . . and only his [Ibarra's] mother and the aunt showed up, but I did ask them if they wanted to come down, let them know because we may need them for punishment, . . . ." When the prosecutor asked Mr. Flynn, "Was there any indication to you that they needed to be subpoenaed?", he said, "No, I understood they would all be cooperative in coming in on their own and they would not be hostile. . . ."

Mr. Flynn explained that with respect to his trial strategy concerning character witnesses, "I don't think that sometimes character evidence always weighs very well with the jury because there's still going to be concern about how those bruises [on I.G.] got there, and that's the main issue we wanted to focus in on." He stated that three

15

witnesses, who were unrelated to Ibarra; i.e., Orlando Ramirez, Thomas De Los Santos, and Melissa Mazzella, "testified at trial, and they got into the fact that [Ibarra] was very good with both children [I.G. and Ibarra's biological daughter] and I thought that would be more powerful to a jury to hear from unbiased witnesses rather than family members testifying about his good character. . . ." He said that Ramirez "mentioned . . . that he [Ibarra] was very good and that [I.G.] was like a daughter to him, . . . ."

With respect to Ibarra's request that his biological daughter testify, Mr. Flynn did not let her testify because she stated in an interview at the Children's Advocacy Center that Ibarra "had been mean to [I.G.] and had hit her. . . ." When the prosecutor asked Mr. Flynn, "[H]ad different people [said] how wonderful he [Ibarra] was, would there have been a good chance the State would have been able to bring up . . . the alleged punching to the victim's mother's stomach or the fact that the Defendant's own daughter witnessed him being violent with the victim?", he said, "Those are always your concerns on those issues."

When asked why he did not call Ibarra's employer to testify, Mr. Flynn stated that "we actually had his employer ready to testify, . . . [but the prosecutor] agreed to let in [Ibarra's] work hours, so we didn't have to call him as a witness. . . ." Mr. Flynn could not think of any other reason to call the employer to testify. When the prosecutor asked Mr. Flynn if, during trial, Ibarra "indicate[d] to you that you needed to call more witnesses?", he said, "The only time that was discussed is when the issue was brought up about the weekend prior [to the discovery of I.G.'s bruises]. . . . [Ibarra] told me that Lorenzo [Rios] was there. . . ." When Ibarra told this to him, Mr. Flynn asked Ibarra's mother, who was at

16

the trial, to contact Lorenzo to see if he was available to testify. She told Mr. Flynn that Lorenzo "could not come down from Houston." Mr. Flynn testified that during the guilt-innocence phase, Ibarra did not mention any more witnesses.

When the prosecutor asked Mr. Flynn about why he did not call any witnesses to testify at the punishment phase, he said that "[t]he only ones we were really left with were the aunt and him [Ibarra] and [Ibarra's] mother. . . ." Mr. Flynn explained that he gave Ibarra's mother the option to testify; however, she told him she was "emotionally distraught" over the verdict and could not testify. He said that neither Ibarra nor his aunt wanted to testify. He stated that if Ibarra "did indicate that maybe we should call some other witnesses or he would like some witnesses to come at punishment . . . I . . . could have asked for more time from the judge. . . ."

On cross-examination, Mr. Flynn testified his defense included the "timeline and the bruising and the aging of the bruises, . . . ." When appellate counsel asked him, "And you have to agree that Lorenzo's affidavit contributes to the fact that these bruises could possibly have been done by someone else?", he said, "Lorenzo's affidavit wasn't dealing with anything that happened two to five days before the event [the discovery of I.G.'s bruises]. . . ." He also stated that Ibarra never said Lorenzo was "anywhere in the picture" two to five days before the discovery of I.G.'s bruises. As far as Mr. Flynn knew, "Lorenzo never gave any statement or any indication that he witnessed bruises on the child the week prior to [the discovery of the bruises]. . . ."

When appellate counsel asked Mr. Flynn if he had waited until after the jury rendered its verdict before asking Ibarra's mother to testify, he said, "I did ask her at that

17

time to testify, but we had talked previously that she may testify at the [punishment] hearing if needed, . . . ." When appellate counsel asked Mr. Flynn if the testimony of Ibarra's ex-girlfriend, Stephanie Rios, would have had a "strong impact" on punishment, he said the CPS records "indicate[d] that Roel [Ibarra] had a temper. . . . [T]hat may have been something that the State could have attacked him on or attacked her on was his temper."

After hearing argument from both sides, the trial court denied the motion for new trial.

### 2. Issues Presented

In issue one, Ibarra argues trial counsel was ineffective during the guilt-innocence phase for failing to call witnesses crucial to his defense. In issue two, Ibarra argues trial counsel was ineffective for failing to present any punishment evidence.

### 3. Standard of Review

*Strickland v. Washington* defines the components required to show ineffective assistance of counsel. 466 U.S. 668, 687 (1984). The two required components are a performance component and a prejudice component. *Id.* First, the defendant must show that counsel's performance was deficient, which requires a showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment of the United States Constitution. *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010). To satisfy this prong of the analysis, the defendant "must show that counsel's representation fell below an objective standard of reasonableness" based upon "prevailing professional norms." *Strickland*, 466 U.S. at 688. For this

performance inquiry, we consider all the circumstances with "a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id.* at 688-89.

Second, the defendant must show that counsel's deficient performance prejudiced the defense. *Perez*, 310 S.W.3d at 893. This requires the defendant to show that counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687). To satisfy this element, the "'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). The defendant has the burden of proving ineffectiveness by a preponderance of the evidence. *Id.* (citing *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005)).

To obtain relief on an ineffective-assistance-of-counsel claim based on an uncalled witness, the appellant must show that the witness "had been available to testify and that his testimony would have been of some benefit to the defense." *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983), see *Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988) (stating that "[a]bsent a showing by appellant that he would have benefitted from the testimony, the decision not to call witnesses at either stage of trial does not raise the specter of ineffective assistance.").

In addition, in order to prevail on a claim of ineffective assistance for counsel's failure to call witnesses, an appellant must present some evidence to rebut the

presumption that counsel exercised sound trial strategy by not calling the witnesses in question. *See Moreno v. State*, 1 S.W.3d 846, 865 (Tex. App.−Corpus Christi 1999, pet. ref'd). Specifically, the appellant must rebut the possibility that trial counsel did not feel the witnesses were material or credible. *See id.* In the context of an ineffectiveness challenge, we will not second guess counsel's decision not to call a witness when "the testimony was a 'double-edged sword' that could have hurt more than it helped." *De Pena v. State*, 148 S.W.3d 461, 470 (Tex. App.−Corpus Christi 2004, no pet.).

We review the trial court's denial of a motion for new trial under an abuse-of-discretion standard. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). We do not substitute our judgment for that of the trial court; rather, we decide whether its decision was arbitrary or unreasonable. *Id.* We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that party. *Id.* Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling. *Id.* The trial court has a right to either believe or disbelieve uncontroverted testimony or affidavits. *Id.* at 210.

### a. Failure to Call Witnesses at Guilt-Innocence Phase

Mr. Flynn testified that I.G. had numerous bruises and that based upon his "review of the experts," her red bruises were zero to forty-eight hours old, and her purple and blue bruises were two to five days old His strategy was to show that the bruising occurred within five days before January 16, 2009, the date the bruises were discovered after

20

Ibarra had been alone with I.G.

None of the affidavits attached to the motion for new trial contain statements showing that any of the affiants, including Lorenzo Rios, saw bruising on I.G. within five days before the date the bruises were discovered. With respect to Mr. Flynn's failure to call Ibarra's employer to testify, we note that Ibarra's defense was not based upon his work schedule; rather, it was based on the possibility that I.G.'s bruises were older than the State's evidence showed and that they occurred prior to the day the bruises were discovered.

Thus, even assuming all of the witnesses who provided affidavits were available to testify at the guilt-innocence phase, their testimony would not have benefitted Ibarra's case. Therefore, appellant has failed to show that counsel's performance was deficient. *See Perez,* 310 S.W.3d at 892-93. Even assuming counsel was deficient in failing to call these witnesses, appellant has failed to show that counsel's deficient performance prejudiced the defense. *Id.* at 893. We hold that the trial court did not abuse its discretion by denying the motion for new trial based upon counsel's failure to call additional witnesses at the guilt-innocence phase. Issue one is overruled.

**b. Failure to Present Punishment Evidence**

Mr. Flynn testified that the witnesses on Ibarra's witness list were notified that they may be needed for punishment. However, only Ibarra's mother, aunt, and brothers showed up for the punishment hearing. Ibarra's mother, Veronica Alvarado, refused to testify at the punishment hearing. She stated in her affidavit that Mr. Flynn did not ask her to be a character witness until the day of the verdict. Had she known ahead of time

21

that Mr. Flynn was going to call her as a character witness, she would have prepared herself emotionally and physically to testify. Mr. Flynn testified that on the day of the verdict, he did ask Alvarado to testify. However, he further testified that he and Alvarado "had talked previously that she may testify at the [punishment] hearing if needed, . . . ."

Ibarra's Aunt Annette stated in her affidavit that she "was present during all of the trial and was available to testify at the time of trial." However, Mr. Flynn testified that when he asked her to testify, she refused to do so.

Mr. Flynn decided not to let Ibarra's brothers testify at the punishment hearing because one of them "had made a comment or a gesture" towards Mazzella and De Los Santos in the "parking lot." Mr. Flynn believed if the brother had testified, the State could have cross-examined the brother about that incident.

During the punishment hearing, Mr. Flynn prevented the State from calling I.G.'s mother, Belinda Garza, to testify concerning Ibarra's prior bad acts. Because the State did not call any other witnesses, the punishment case for both sides was dependent upon the evidence presented at the guilt-innocence phase. During that phase, Mr. Flynn elicited testimony from three witnesses regarding Ibarra's character and his relationship with I.G. Orlando Ramirez testified Ibarra was a "good friend" to him and "was good" with I.G. He said Ibarra baby-sat I.G., took care of her, fed her, and treated her and his (Ibarra's) biological daughter "equally."

De Los Santos testified Ibarra would come over to his apartment with I.G. He stated that Ibarra treated I.G. "good" and was "nice" to her. He "never noticed anything unusual" between Ibarra and I.G.

22

Melissa Mazzella testified she "never saw anything wrong between" Ibarra and I.G., and she remembered telling the police that Ibarra "had a good relationship with" I.G. She also saw Ibarra with his biological daughter and said that what she saw between them was "very good."

Accordingly, before assessing punishment, the trial court had heard testimony about Ibarra's good character and his good relationship with I.G. Thus, even assuming counsel was deficient for failing to present evidence during the punishment hearing, appellant has failed to "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Strickland*, 466 U.S. at 694). We hold that the trial court did not abuse its discretion by denying the motion for new trial based upon counsel's failure to present evidence at the punishment hearing. Issue two is overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
13th day of January, 2011.

23